IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE TRACKING OF CELLULAR TELEPHONE (417) 297-1232, INCLUDING CELL SITE, TRIANGULATION, AND GPS | No. 17-SW-3024-DPR<br><br>(UNDER SEAL) |

### EXHIBIT "A"
### AFFIDAVIT IN SUPPORT OF APPLICATION

1. I, Jason R. Carter, am a detective with the Springfield, Missouri, Police Department (SPD) assigned as a Task Force Officer (TFO) to the United States Drug Enforcement Administration (DEA) Springfield, Missouri, Resident Office. My primary duty assignment is to enforce the drug laws of the United States of America. I submit this Affidavit in support of the attached Application for an Order authorizing the tracking of cellular telephone number (417) 297-1232 (hereinafter, the "Target Telephone"), to include Global Positioning System (GPS) location, cell site location information, triangulation, and the disclosure of location-based data. I set forth the following facts showing that there are sufficient grounds to believe that the GPS location, cell site, and other subscriber records and information pertaining to the Target Telephone will likely be relevant and material to an ongoing criminal investigation.

2. The information contained in this affidavit is based upon my personal knowledge of the investigation, and information provided to me by other law enforcement agents involved in the investigation of this case. This affidavit contains the facts necessary to establish probable cause to track the Target Telephone. Not all of the facts known to me about this investigation have been included.

3.      As a DEA TFO, I am a law enforcement officer of the United States, and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21 of the United States Code, the Controlled Substances Act. I have been a sworn law enforcement officer for over six years. I have been assigned as a TFO with the DEA's Springfield, Missouri, Resident Office for approximately one year and four months. I have received specialized training relating to the manufacture, distribution, and possession with intent to distribute controlled substances. Based upon my training and experience, I have extensive knowledge of complex illegal drug manufacturing and distribution operations.

4.      On December 30, 2016, Missouri State Highway Patrol (MSHP) Sergeant Musche arrested Carrie A. PENATE at her residence located at 2312 County Lane 137, Carthage, Missouri, pursuant to a felony warrant for possession of a controlled substance issued out of Oklahoma, along with four misdemeanor warrants for local ordinance violations.

5.      After arresting PENATE, Sergeant Musche transported her to the MSHP Troop D Satellite Office in Carthage, Missouri. Once at the Satellite Office, Sergeant Musche advised PENATE of her *Miranda* rights and conducted an interview of PENATE. PENATE stated she is from California and she knows John G. MARTINEZ. PENATE grew up with MARTINEZ in California. PENATE stated that approximately one year ago, MARTINEZ contacted PENATE and her girlfriends in Joplin, Missouri, via Facebook. PENATE stated MARTINEZ started contacting PENATE's friend, Kiley M. CARPENTER. MARTINEZ wanted to meet CARPENTER, so in July 2016, PENATE and CARPENTER traveled to California with Joel BELL, Lee WILLIAMS, and Katie BRUMMETT.

6. PENATE stated a couple weeks after she returned from California, CARPENTER told her that BELL was receiving methamphetamine from MARTINEZ in the mail and sending cash back to him.

7. Earlier, on December 22, 2016, in a post-*Miranda* interview with BELL, he had admitted to Sergeant Musche he had gone on the California trip with PENATE and later received methamphetamine from MARTINEZ through the mail.

8. On January 12, 2017, Sergeant Musche obtained a search warrant for a suspect package being shipped from West Sacramento, California, to Ashley Blair, 603 Cherry Street, Carl Junction, Missouri. Based on the ongoing investigation, Sergeant Musche believed MARTINEZ had shipped the package. Upon opening the package, Sergeant Musche found approximately eight (8) ounces of methamphetamine. A small bag containing a representative sample of the methamphetamine was left in the package and the package was released to Ozark Drug Enforcement Taskforce (ODET) TFO Chad Allison for a controlled delivery to 603 Cherry Street.

9. Later that day, TFO Allison approached the front door of 603 Cherry Street and knocked on the door. The door was opened by a white female, later identified as Jessica PALMER. TFO Allison asked PALMER if she was Ashley Blair and she stated she was. TFO Allison requested PALMER sign a FedEx package receipt form and she did so. PALMER took custody of the box that contained a representative sample of methamphetamine and went back inside the trailer. A few moments later, a search warrant was served on the residence and PALMER was arrested.

10. During a post-arrest interview, PALMER stated she signed Ashley Blair's name on the package receipt form and that Blair was not involved. PALMER said she paid Blair for letting PALMER use her house to receive the package. PALMER told investigators the

methamphetamine was supplied by MARTINEZ. PALMER has never met MARTINEZ and did not know if that was his real name.

11.     PALMER stated that over the past few weeks she had received three packages containing methamphetamine, including the one from earlier that day. MARTINEZ had contacted her via Facebook messenger, but she did not know how MARTINEZ got her name. MARTINEZ told her he would send her methamphetamine if PALMER would send him money. MARTINEZ had PALMER send half of the money up front before MARTINEZ sent the first package. PALMER sold and/or used all the methamphetamine that was sent in the packages. The two previous packages MARTINEZ sent to PALMER each contained four ounces of methamphetamine. MARTINEZ would send PALMER the tracking number for the packages he was sending. PALMER would not receive any more until she paid MARTINEZ. In addition to Facebook messenger, PALMER also communicated with MARTINEZ on the telephone. PALMER had talked to MARTINEZ on the telephone on the day of the package delivery.

12.     PALMER paid money or methamphetamine to friends of hers who would send money to MARTINEZ. PALMER had people send MoneyGrams from Wal-Mart or go to a credit union to deposit money into MARTINEZ's account. PALMER had been to the credit union a couple times and had taken people there to deposit money. Individuals sending money had to use their real names when sending money because they had to show identification.

13.     Sergeant Musche learned that the individuals were using Joplin Metro Credit Union to make the cash deposits of drug proceeds generated from the methamphetamine supplied by MARTINEZ.

14.     Sergeant Musche contacted employees at Joplin Metro Credit Union and obtained a list of individuals who had made deposits at Joplin Metro Credit Union into a "shared branch"

account with Golden 1 Credit Union owned by MARTINEZ. A shared branch account allows deposits and withdrawals to be made at affiliated credit unions.

15. Joplin Metro Credit Union provided information on the following deposits to MARTINEZ's account at Golden 1 Credit Union: On February 13, 2017, Daniel VALLEJO deposited $500 cash. On February 17, 2017, VALLEJO deposited $250 cash. On February 21, 2017, VALLEJO deposited $1,650 cash. On February 23, 2017, VALLEJO deposited $1,700 cash. On February 24, 2017, VALLEJO deposited $1,700 cash. On each occasion, VALLEJO provided (417) 297-1232, the Target Telephone number, to Joplin Metro Credit Union employees as his contact number.

16. In her December interview with Sergeant Mushe, PENATE said she had heard that Kristina THOMPSON was also receiving packages from MARTINEZ. The same records from Joplin Metro Credit Union showed that THOMPSON had made deposits into MARTINEZ's account twice in December totaling $950, and once on January 30, 2017, for $500.

17. On February 27, 2017, Sergeant Musche contacted me regarding VALLEJO. PENATE had told Sergeant Musche that VALLEJO had left Carthage, Missouri, sometime over the weekend with an individual known as "Sergio." PENATE had been told by CARPENTER, who is VALLEJO's girlfriend, that CARPENTER could not locate VALLEJO. Another man named DUSTIN TEETER had also told PENATE that VALLEJO and "Sergio" had gone to California with the intent to obtain approximately four pounds of methamphetamine from MARTINEZ and transport the methamphetamine back to the Joplin, Missouri, area. PENATE provided the Target Telephone Number, as VALLEJO's contact number.

18. On February 27, 2017, I contacted T-Mobile and received confirmation that T-Mobile is the service provider for the Target Telephone and that the Target Telephone is active.

The listed Target Telephone's subscriber is "Justin Case," with an address of 920 South Monroe Avenue, Joplin, Missouri. PALMER'S current home address is 920 South Monroe.

19. On February 28, 2017, Sergeant Musche was contacted by a known and reliable confidential informant (CI). The CI has proven reliable in the past in that Sergeant Musche has worked with the CI in a previous investigation during which he corroborated the information provided by the CI with his independent investigation. On February 28, 2017, the CI told him that THOMPSON had instructed him/her to contact Jimmy REEDY to gather money together because a large amount of methamphetamine would be arriving in Joplin in approximately two days.

20. On February 28, 2017, Sergeant Musche went to the McDonald County, Missouri, Jail to speak to Craig WITTINGTON. WITTINGTON had been arrested in McDonald County after attempting to flee from law enforcement with approximately a half ounce of methamphetamine and a firearm. In a post-*Miranda* interview, WITTINGTON admitted that he was working with VALLEJO to distribute methamphetamine that VALLEJO was receiving from MARTINEZ and that he and VALLEJO primarily communicate via text message about their distribution activity. WITTINGTON did not know VALLEJO's cellular telephone number.

21. In my experience, the general location of the Target Telephone, gathered from cell site/sector location, GPS location, or other means, can yield evidence that is relevant and material to an ongoing criminal investigation of the specified offenses. Such information can include leads relating to: (1) the geographic breadth of the suspected drug trafficking cell; (2) the transportation routes and means for trafficking narcotics and drug proceeds from one geographic area to another; (3) other geographic locations where a drug organization may be engaging in similar conduct; (4) the geographic location of "stash" houses; and (5) the geographic locations where meetings are held to exchange drugs and money. Further, the geographic location of the Target Telephone can

6

be used to corroborate the observations of surveillance agents. Surveillance agents can compare observations of the user of the Target Telephone with geographic information in order to verify the identification and location of the user of the Target Telephone.

22. In light of the nature of this affidavit and in order to keep from compromising the ongoing nature of this investigation, I request that it be sealed, and that service of the order granting authorization for tracking the Target Telephone be delayed for 30 days following termination of the period of tracking.

Further your affiant sayeth naught.

Jason R. Carter
Task Force Officer
Drug Enforcement Administration

Subscribed and Sworn to me, this 1st day of March, 2017, in the Western District of Missouri.

Honorable David P. Rush
United States Magistrate Judge
Western District of Missouri